IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MANUEL MUNGUIA and DOROTHY
McGHEE, on Behalf of
Themselves Individually and on
Behalf of All Others Similarly
Situated,

              Plaintiffs,

      v.

STATE OF ILLINOIS, GARY
HANNIG, JOE CLARY, REGIONAL
TRANSPORTATION AUTHORITY,
ILLINOIS DEPARTMENT OF
TRANSPORTATION, SECRETARY OF
THE ILLINOIS DEPARTMENT OF
TRANSPORTATION, DIRECTOR OF
ILLINOIS DEPARTMENT OF
TRANSPORTATION'S DIVISION OF
PUBLIC AND INTERMODAL
TRANSPORTATION, and NORTHEAST
ILLINOIS REGIONAL COMMUTER
RAILROAD CORPORATION, d/b/a
METRA,

              Defendants.

Case No. 10 C 0055

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

    Before the Court are Motions to Dismiss filed by Defendants
State of Illinois, Regional Transportation Authority and Northeast
Illinois Regional Commuter Railroad Corporation, d/b/a Metra.  In
addition to the above motions, Plaintiffs' have filed a Motion to
Strike References to Materials Extraneous to the Pleadings.  For

the reasons stated herein, Plaintiffs' Motion to Strike is denied, and Defendants' Motions to Dismiss are granted.

## I. <u>BACKGROUND</u>

Plaintiffs Manuel Munguia and Dorothy McGhee filed a class action complaint which claims that Defendants discriminate against minorities in the City of Chicago by disproportionately funding suburban mass transit over urban mass transit. This general claim is broken down into three counts which each allege the violation of a particular law: (Count I) Fourteenth Amendment Equal Protection Clause through 42 U.S.C. § 1983, (Count II) Title VI of the Civil Rights Act of 1964, and (Count III) Illinois Civil Rights Act of 2003.

### A. Facts

Plaintiffs filed a fifty-six page complaint which details the history of mass transit in the Chicago region and describes the present effects of this history. Rather than recreate the description, this Court will only briefly describe the most relevant facts for these motions to dismiss.

The Chicago metropolitan area is served by a collection of mass transit organizations. Defendant Regional Transit Authority (the "RTA") is responsible for overseeing three Service Boards: the Chicago Transit Authority (the "CTA"), Commuter Rail Board (known as "Metra"), and Suburban Bus Board (known as "Pace"). The CTA is not a party to this suit, but serves the City of Chicago and

the most densely populated portions of suburban Cook County with a mixture of heavy rail and bus service. Defendant Metra primarily serves commuters in the suburbs of Cook County and the "collar counties" of Lake, McHenry, Kane, DuPage, and Will with heavy rail service. Pace is not a party to this suit, but primarily serves the suburban areas with bus service and provides paratransit service to the entire the RTA region. Plaintiffs allege that the service areas have different demographics, resulting in CTA's 60% minority ridership compared to Metra's 30% minority ridership.

The RTA was established in 1974 by the Illinois General Assembly with concurrent approval by a referendum in Cook County and the collar counties. The 1974 RTA Act was intended to address mass transit shortcomings in the Chicago metropolitan region by creating a central authority that could improve service and provide financial stability for mass transit operations. The 1974 RTA Act was unpopular with suburban residents, who criticized the system and advocated for changes in the way the RTA was structured and operated. Just as an example, although the RTA referendum passed by a vote of 684,266 to 671,287 overall, almost 81% of voters in the collar counties voted "no." *See* Paul Gapp, *RTA Referendum Shows Widening City, Suburb Rift*, Chi. Trib., Apr. 28, 1974.

In 1983, the RTA Act was amended and the RTA was reorganized. Although the system has been modified since 1983 by further legislation, the essence of the regional organization has not been

fundamentally changed since the 1983 amendment. The organizational scheme vests operational responsibilities in the Service Boards, leaving the RTA with general oversight duties. The RTA is responsible for reviewing and approving the budgets, capital plans, and expenditures of the Service Boards as well as developing a five-year capital plan for the region. The RTA is also responsible for distributing certain funds to the Service Boards. Some of these funds are distributed pursuant to strict statutory mandates, while other funds are distributed according to the discretion of the RTA.

The region's mass transit system has a complex funding scheme. There are a number of funding sources, including fare revenues as well as local, state, and federal government funding. Some of this funding is mandated by statute or based on tax revenues while other funding is grant based. While Plaintiffs complain about the funding scheme as a whole, it is clear from the nature of the complaint and the types of facts alleged that the allocation of sales tax revenues is a major component of the funding scheme and therefore a critical part of their Complaint.

The RTA sales tax, currently 1.25% in Cook County and 0.5% in the collar counties, is allocated to the transit agencies based in part on where the tax is collected. These tax rates are a relatively recent development, as the rates were 1.0% and 0.25% until they were each increased by 0.25% in 2008. The table below

was created using the Complaint, the relevant statute, and some math, and it summarizes how sales tax revenues are allocated based on the area in which the taxes were collected. [Compl. ¶ 84, 128]; 70 ILCS 3615/4.03.3.

| Recipient of Taxes | Taxes Collected In | | |
|---|---|---|---|
| | City of Chicago | Suburban Cook County | Collar Counties |
| CTA | 68% | 20.4% | 0% |
| Metra | 0% | 37.4% | 29.75% |
| Pace | 0% | 10.2% | 12.75% |
| RTA | 12% | 12% | 7.5% |
| Special (see below) | 20% | 20% | 50% |

The funds in the "special" category are those raised from the 0.25% increase in sales tax. These funds are first used to pay a specific amount, which varies annually according to a formula, to the "ADA Paratransit Fund," the "Suburban Community Mobility Fund," and the "Innovation, Coordination and Enhancement Fund." 70 ILCS 3615/4.03.3. After this set-aside is removed from the total, the balance is allocated 48% to CTA, 39% to Metra, and 13% to Pace. *Id.* at 4.03.3(c).

The funds allocated to the RTA are used for multiple purposes, such as paying for its own costs and servicing debt. However, The RTA can funnel a portion of this funding to the Service Boards, and

has some discretion in choosing where to send the funding and for what projects. While the RTA has this discretion, Plaintiffs admit in the Complaint that The RTA has "given the CTA the bulk of the 15% discretionary fund" ever since the inception of the funding scheme. The "15% discretionary fund" refers to the RTA's total sales tax allocation, which is 15% of the proceeds from the original 1.0% and 0.25% sales tax rates.

The RTA also has some discretion in setting the recovery ratios that each Service Board must meet. The recovery ratio for a Service Board is the percentage of operating costs which must be recovered through fare revenues. The RTA is required by statute to attain an overall recovery ratio of 50% among the three Service Boards, but they may set the recovery ratio for each Service Board separately. The Complaint claims that the current recovery ratio set for the CTA is discriminatory, but it does not list the current recovery ratios set for the three Service Boards. It only mentions that Pace has historically been given a ratio in the 40% range while the CTA has been given a ratio of over 50%, which is similar to the ratio set for Metra.

### B. Procedure

Plaintiffs Munguia and McGhee filed a Class Action Complaint against Defendants seeking to change this funding scheme on the grounds that it discriminated against minorities, in particular African American and Hispanic citizens.

Count I alleges that all the Defendants except the State of Illinois and the Illinois Department of Transportation have violated Plaintiffs' right to equal protection of the laws under the Fourteenth Amendment. Count II alleges that all the Defendants have violated Title VI of the Civil Rights Act of 1964. Count III alleges that the RTA and Metra have violated the Illinois Civil Rights Act of 2003.

The State Defendants (the State of Illinois; Gary Hannig, Secretary of the Illinois Department of Transportation; Joe Clary, Director of the Illinois Department of Transportation's Division of Public and Intermodal Transportation; and the Illinois Department of Transportation) move to dismiss based on Plaintiffs' lack of standing, Plaintiffs' failure to state a claim upon which relief can be granted, and the statute of limitations.

Defendant RTA moves to dismiss based on Plaintiffs' lack of standing, Plaintiffs' failure to state a claim upon which relief can be granted, laches or the statute of limitations, and federal law prohibitions against the suit.

Defendant Metra moves to dismiss based on Plaintiffs' failure to state a claim upon which relief may be granted.

Plaintiffs responded to all three motions to dismiss, and move to strike exhibits attached to the motions to dismiss by the RTA and Metra because such exhibits were not attached to the Complaint and are improper for a motion to dismiss.

## II.  **LEGAL STANDARD**

A Rule 12(b)(6) motion to dismiss should be granted if the complaint fails to satisfy Rule 8's pleading requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief."  For a motion to dismiss, the Court accepts as true all factual allegations in a complaint.  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## III.  **ANALYSIS**

Plaintiffs' Motion to Strike is relevant to what information this Court may consider on the Motions to Dismiss, so it will be considered first.  The subsequent four sections will consider the three motions to dismiss.  The first three sections will consider each Defendant's unique grounds for dismissal, and the last section will consider the common grounds for dismissal which are applicable to all the defendants in the case.

### A.  **Plaintiffs' Motion to Strike**

Plaintiffs move to strike the references to the AG Report, two budget reports, and a flow chart in the Motions to Dismiss by Defendants RTA and Metra.  Plaintiffs claim that these Defendants are referencing and relying on materials that have not been

attached to and are outside of Plaintiffs' Complaint, and these references should be stricken because they are prohibited by Seventh Circuit law.

Considering the flow chart first, Plaintiffs cannot complain that the entire chart is an extraneous matter. The flow chart summarizes the RTA's interpretation of the statutes which control the funding allocation, which is a permissible argument at this stage and will not be excluded. However, the flow chart also makes some factual statements, and these will not be relied upon by the court.

The other three documents are being referenced, at least in part, for factual context. "If on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d). This language is mandatory, so a court must convert a motion to dismiss under Rule 12(b)(6) to a motion for summary judgment under Rule 56 if extraneous matters are presented and not excluded. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).

Determining what matters are extraneous to the pleadings is the challenge for this motion. In *Tierney*, the Seventh Circuit found that a document which a defendant attaches to a motion to dismiss is considered part of the pleadings if the document is:

(1) "referred to in the complaint," (2) "concededly authentic," and
(3) "central to the plaintiff's claim." *Tierney v. Vahle*, 304 F.3d
734, 738 (7th Cir. 2002).  The Seventh Circuit "has been relatively
liberal in its approach to the rule articulated in *Tierney*."
*Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009).

The first element of the *Tierney* test is clearly met.  The
Complaint devotes an entire heading to the AG Report with eleven
numbered paragraphs describing the report, how it supports the
claims, and quoting passages.  The two budget reports are also
cited to throughout the Complaint.

The second element is also satisfied.  The AG Report and the
two budget reports are public documents whose authenticity is not
questioned by either party.

The third element, whether the documents are central to the
plaintiff's claim, is a closer call.  Plaintiffs reference the AG
Report and budget reports for facts as well as statements made by
Defendants in this case.  The Plaintiffs rely on these documents to
prove that Defendants knew about the effects of their actions,
which is evidence of intentional discrimination.   Intentional
discrimination is a critical element of Plaintiffs' claims and the
statements made in these documents are a vital part of Plaintiffs'
evidentiary basis for this element.   Thus, the documents are
central to Plaintiffs' claims.  Plaintiffs' Motion to Strike all
the references is denied.  Even though the three elements are met,

this does not mean that Plaintiffs have admitted to the facts or adopted the statements in the documents, or that this Court will rely on the data gathered in the documents. The documents are only considered as part of the pleadings to provide context to the statements and facts which are central to Plaintiffs' claims. Since this is a Motion to Dismiss, the Court will disregard any references to these documents intended to disprove facts which are properly pled in the Complaint.

The RTA and Metra seek to include the documents in their entirety on the independent ground that they are public records of which this Court may take judicial notice. "[T]here exists a narrow exception to the Rule 12(d) instructions that permits a district court to take judicial notice of matters of public record without converting a Rule 12(b)(6) motion into a motion for summary judgment." *Doss v. Clearwater Title Co.*, 551 F.3d 634, 640 (7th Cir. 2008). However, a court must take care when it uses judicial notice, because "a judicially noticed fact must be one not subject to reasonable dispute." FED. R. EVID. 201(b). The documents present a number of facts and opinions which are subject to reasonable dispute, such as the net financial effect of the funding scheme for residents of the City of Chicago, so it is not appropriate at this juncture to consider judicial notice. The analysis does not change merely because the reports are admissible evidence under a hearsay exception, as "[i]t takes more than an

exception to the hearsay rule . . . to justify judicial notice."
*Doss*, 551 F.3d at 640.

## B.  Metra's Motion to Dismiss

Metra's unique ground for dismissal is that Plaintiffs have failed to point out a causal connection between Metra's actions and the wrong alleged.  Plaintiffs base their claims against Metra on two different actions:  Metra's role in creating and continuing the funding scheme, and Metra's provision of mass transit services in its own region.  As to the first action, Metra argues that its lobbying efforts to increase its own funding cannot be the basis of a discrimination claim under the *Noerr-Pennington* doctrine.  As to the second action, Metra argues that Plaintiffs failed to state a claim that Metra's service discriminates against minorities.

Plaintiffs must demonstrate that Metra's role in creating and continuing the funding scheme caused the discrimination suffered by Plaintiffs.  The difficulty with establishing causation in this case is that Metra is alleged to be the beneficiary of an imbalanced funding scheme and not the designer or executor of the scheme.  Plaintiffs argue that Metra petitions or lobbies for funding, and this action is a proximate cause of the imbalanced funding between CTA and Metra.

The difficulty with this line of reasoning is that the Supreme Court has been wary of holding defendants liable for the outcome of lobbying efforts.  *See United Mine Workers of Am. v. Pennington*,

381 U.S. 657, 670 (1965); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961). The *Noerr-Pennington* doctrine originated in the antitrust field, but it has since been recognized as a generally applicable doctrine that grants immunity for actions conforming to the First Amendment's speech and petitioning clauses. *New West, L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007). This immunity extends to the petitioning of federal and state government at all levels, including agencies. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 511 (1972). Lobbying by municipalities is protected in the same manner as lobbying by private citizens. *New West*, 491 F.3d at 722. In the present case, any petitioning of the RTA or state legislators by Metra is protected under the *Noerr-Pennington* doctrine. Metra is permitted to petition government officials to obtain the best service for those citizens it serves. *See*, *e.g.*, *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1093 (9th Cir. 2000).

Looking at the same problem from a different angle, it is unreasonable to hold Metra accountable for ensuring that the Illinois General Assembly and the RTA provide non-discriminatory funding. Plaintiffs failed to state any legal theory that would place an affirmative duty on Metra to intervene and prevent others from discriminating, or even a theory describing Metra's authority over the RTA or the General Assembly. Plaintiffs have stated no

cause of action based on Metra's lobbying efforts or its failure to oversee and regulate the decisions of others in regards to the distribution of mass transit funds.

The second basis for the claim against Metra is that Metra fails to provide minorities with equal access to its commuter rail service. Plaintiffs allege that Metra has failed to build stations in minority neighborhoods. The problem here is that Plaintiffs lack standing to bring this claim against Metra. Standing is part of the threshold Article III requirement that "those who seek to invoke the power of federal courts must allege an actual case or controversy. Plaintiffs in the federal courts must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction." *O'Shea v. Littleton*, 414 U.S. 488, 493 (1974) (omitting quotations and citations). Plaintiffs allege only that they are regular users of CTA services. They make no allegations that they use Metra service or have been deprived of Metra service due to discriminatory capital expenditures. They have alleged no injury as part of this claim. At best, this is an attempt by Plaintiffs to vindicate the rights of minorities in other areas, which does not satisfy the standing requirement absent certain circumstances not alleged in the present case. *See id.* at 494 ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may

seek relief on behalf of himself or any other member of the class.").

In addition, Plaintiff must provide more than vague and conclusory accusations of wrongdoing by Metra. For example, if Metra has failed to build stations where an equitable capital planner would have, or has built a station where an equitable planner would not have, that should be alleged with some factual basis in the complaint. Plaintiffs must present sufficient facts that make a claim for discrimination plausible. *Iqbal*, 129 S.Ct. 1937. They have presented no facts which meet this standard, and so they have not sufficiently presented a claim against Metra upon which relief can be granted. Metra's Motion to Dismiss the Complaint, as to itself, is granted.

### C. State Defendants' Motion to Dismiss

The State Defendants' unique ground for dismissal is also based on causation. They claim that Plaintiffs fail to point out how the Illinois Department of Transit or its officials Hannig and Clary (the "IDOT Defendants") caused the wrong alleged. This defense is similar to Metra's defense: Plaintiffs have not pointed to any action, or inaction when a duty to act existed, on the part of the IDOT Defendants that caused an injury.

The IDOT Defendants argue that they have no authority to supervise the RTA or Service Boards or to control funding. They support this by reference to statutes which suggest that the RTA

receives most of its funding directly from the state treasury without IDOT acting as an intermediary.  Plaintiffs correctly point out the weakness in this argument:  if *most* of the funding goes straight to the RTA, then *some* funding still goes through IDOT. For example, IDOT Defendants admit that 20 ILCS 2705/2705-305 authorizes IDOT to "supplement federal funding by administering a state matching grant."  While this source of funding may be small compared to the overall funding scheme, Plaintiffs have sufficiently pled that IDOT Defendants have some authority over the funding of certain mass transit projects in the Chicago metropolitan area.  The IDOT Defendants will not be dismissed from the case based on their allegations that they have no discretion over mass transit funding.

### D.  The RTA's Motion to Dismiss

The RTA moves to dismiss based on one unique ground for dismissal:  the RTA cannot be held liable under the Illinois Civil Rights Act (the "ICRA") for following the statutory mandates in the RTA Act.  This defense only applies to Count 3.

The ICRA states that "[n]o unit of State, county, or local government in Illinois shall . . . exclude a person from participation in, deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of that person's race, color, national origin, or gender." 740 ILCS 23/5.  The RTA asks this Court to dismiss this Count

because Plaintiffs cannot hold The RTA liable under the ICRA for obeying the statutory mandates of the RTA Act.

The ICRA, as an Illinois statute, does not overrule a previous statute if the two statutes do not relate to the same subject matter such that they are in irreconcilable conflict. *See Ill. Native Am. Bar Ass'n v. Univ. of Ill.*, 368 Ill. App. 3d 321, 328 (1st Dist. 2006). Nothing in the ICRA suggests that it overruled the original RTA Act. This interpretation is particularly difficult to argue against because the legislature amended the RTA Act in 2008, with no mention of any conflict, four years after the passage of the ICRA. Even if the statutes could conflict, the 2008 RTA Act amendments were both later in time and more specific, so they would govern over the ICRA. *See National Assoc. of Property Owners v. United States*, 499 F.Supp. 1223, 1244 (D. Minn. 1980), *aff'd sub nom. Minn. ex rel. Alexander v. Block*, 660 F.2d 1240 (8th Cir. 1981).

The RTA correctly points out that it cannot be held liable under the ICRA for its actions in following the funding mandates of the RTA Act. This includes distributions required by the RTA Act. Any claims based on mandated actions such as these are dismissed. Count 3, however, does not limit itself to actions taken to fulfill a statutory mandate. Plaintiffs allege in other areas of the Complaint that the RTA has some discretion over certain funding and capital planning, and these choices may still violate the ICRA.

These discretionary actions may be reached by the ICRA, and so they will not be dismissed on this ground.

### E.  Common Grounds for Dismissal

The gravamen of the Complaint is that the funding scheme as a whole is unconstitutional under the Equal Protection Clause and violates Title VI and the ICRA because it discriminates against minorities.  Plaintiffs have pointed to no facial discrimination in any statute or practice and instead proceed under the allegation that Defendants' actions discriminate against minorities in practice.

This allegation requires, among other elements, proof that Plaintiffs were treated differently, due to their race, than other similarly situated persons.  *See Smith v. City of Chicago*, 457 F.3d 643, 650 (7th Cir. 2006).  This element, a racially disparate effect, must be proven for all three of Plaintiffs' legal theories. *See id.* (Equal Protection); *N.Y. City Envtl. Justice Alliance v. Giuliani*, 214 F.3d 65, 69 (2nd Cir. 2000) (Title VI); *McFadden v. Bd. of Educ.*, No. 05 C 0760, 2006 U.S. Dist. LEXIS 74380 (N.D. Ill. Oct. 3, 2006) (ICRA).  One difference between the three legal theories is that the Plaintiff is required to prove intentional discrimination under the Equal Protection Clause and Title VI, while no such requirement exists for the ICRA.  *See Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (Equal

Protection); *Alexander v. Sandoval*, 532 U.S. 275 (2001) (Title VI); *McFadden*, 2006 U.S. Dist. Lexis 74380 at *27 (ICRA).

Plaintiffs' Complaint is long and filled with allegations of disparities, but the focus of the legal claim is rather sharp: the funding scheme. Plaintiffs are not complaining that CTA is mismanaged or making operational decisions to the detriment of minorities. CTA is not a party to this litigation, and the Complaint is actually quite complimentary of both CTA's current efficiency and its service aspirations. Plaintiffs make no claim that the CTA is receiving inferior access to resources, such as personnel and facilities, or services, such as the RTA's expertise with oversight and planning.

Defendants all move to dismiss the heart of Plaintiffs' complaint based on three grounds: a failure to allege a racially disparate effect, a failure to allege intentional discrimination, and a lack of standing.

### 1. *Racially Disparate Effect*

To proceed on a claim of race discrimination, Plaintiffs must sufficiently plead a racially disparate effect. Plaintiffs' allegations concerning this element can be categorized into those describing the relative financial health of the mass transit organizations and those describing the relative funding levels of the mass transit organizations.

Plaintiffs assert that Metra is financially stable while CTA is near to financial ruin. They cite to the AG Report's statement that "Metra is in good financial position . . . its current assets exceed its current liability by a 30 percent margin. Capital investment for the replacement of plant and equipment is keeping pace with the aging of the capital asset base. . . ." In comparison, they cite the AG Report as saying "CTA is minimally liquid; its current liabilities exceed its current assets. . . . Capital investment for replacement of plant and equipment is not keeping pace with the aging of the capital asset base." The CTA has sought one-time funding maneuvers to cover budget deficits and avoid service cuts on a few occasions. Its pension obligations remain underfunded due to years of reduced contributions. The end result is that Plaintiffs allege that the CTA is on the brink of drastic service cuts to curtail expenses while Metra is in solid financial condition and expects to continue expanding service.

Plaintiffs' second category of allegations attempts to connect the financial health of the organizations to the funding scheme. This is an important step, because CTA's financial status would not be the basis for a claim unless Defendants wrongfully caused the disparity between the financial conditions of Metra and CTA. Plaintiffs note that since 1983, CTA's operating funding has decreased from 71% of the RTA's funding to 59% even though CTA serves 82% of the RTA's daily riders. They compare this to Metra,

which they claim currently receives 27% of the operating subsidies but serves only 12% of the region's riders. Plaintiffs next look at how fares have changed over the years, and find that the CTA was forced to raise fares 122% from 1985-2005 while Metra only increased its fares 30%. Plaintiffs also complain that the CTA was forced to make service cuts impacting millions of rides over the years and have proposed service cuts of 17.7% for bus service and 9.8% for rail service pending if no additional funding sources are found.

Plaintiffs also mention in passing that the RTA's setting of the recovery ratio has been discriminatory. Plaintiffs do not claim that the RTA set a higher recovery ratio for the CTA than Metra. Instead, they claim that attaining a high recovery ratio is more difficult for the CTA than Metra because it "has always been less costly per passenger in terms of operating cost to run heavy rail through corridors with a strong ridership base than buses." If the CTA is arguing that it deserves a lower recovery ratio because it is dissimilar from Metra, such an argument cuts against its own claims that the CTA and Metra riders are "similarly situated." *See Ind. State Teachers Ass'n v. Bd. of Sch. Comm'rs*, 101 F.3d 1179, 1182 (7th Cir. 1996) (Equal Protection clause is inapplicable when groups are "unequal in a rationally relevant respect"). This difficulty need not be resolved, because Plaintiffs argument concludes that the net effect of this ratio

setting is that the CTA receives fewer subsidies, and so it does not establish an argument separate from their disparate subsidy argument.

Plaintiffs emphasize one particular statistic as demonstrating a disparity between the CTA and Metra funding. Plaintiffs claim that CTA receives $0.87 of operating funding and $0.95 of capital funding per passenger-trip while Metra receives $4.42 of operating funding and $4.41 of capital funding per passenger-trip. The fundamental complaint is that there is a disparity because the CTA and Metra receive different subsidies per passenger-trip, and the Complaint states that "'[s]ubsidy per passenger-trip' is the most appropriate way to measure subsidization of public transit systems." Defendants move to dismiss the Complaint on the grounds that this is insufficient evidence of a racially disparate effect.

A plaintiff must demonstrate a disparate effect using some appropriate measure that can adequately capture how a plaintiff is treated differently as a member of a protected group. *See N.Y. Urban League, Inc. v. New York*, 71 F.3d 1031, 1037-38 (2d Cir. 1995); *see also Darensburg v. Metro. Transp. Comm'n*, 611 F.Supp.2d 994, 1042 (N.D. Cal. 2009) ("the practice in question has caused the exclusion of . . . plaintiffs because of their membership in a protected group") (citation omitted). As a side note, the Court has not found much legal precedent on this issue. The cases found offer some legal insights, but they do not consider a funding

scheme similar to the one at issue in the present case. *See N.Y. Urban League*, 71 F.3d 1031; *Darensburg*, 611 F.Supp.2d 994; *Comm. For a Better N. Phila. v. Se. Pa. Transp. Auth.*, No. 88 1275, 1990 U.S. Dist. LEXIS 10895 (E.D. Pa. 1990).

Defendants' main contention is that Plaintiffs' analysis of subsidy per passenger-*trip* fails to establish a racially disparate effect. As an example, and without taking their facts as true, Defendants argue that subsidy per passenger-*mile* is just as relevant, and under this measure the CTA receives $0.37 in subsidy per passenger-mile while Metra receives only $0.16. There are a number of possible ways to measure the funding level of the CTA compared to Metra, such as subsidy per trip, passenger-mile, mile of track, or vehicle hour, and Plaintiffs need not describe all these statistics to state a claim. But, Plaintiffs must allege a measure that "adequately captures" all the operational differences between the CTA and Metra so that their claim demonstrates a racial disparity rather than just an operational difference. *See N.Y. Urban League*, 71 F.3d at 1037-38.

Plaintiffs' focus on the subsidy per passenger-trip sounds plausible in the abstract, but it must be evaluated in light of the circumstances of this case. Since 1983, mass transit funding in the Chicago Metropolitan Region has been raised and allocated based in large part on geographic regions. As shown in the table earlier, the RTA Act allocates most of the sales tax proceeds to

the Service Board which serves the area in which the tax was collected. Since the CTA is the primary mass transit provider for the City of Chicago, the bulk of the taxes collected in the City of Chicago go to the CTA. Similarly, the bulk of the taxes collected in the collar counties go to Metra and Pace, which serve those areas. All three Service Boards serve suburban Cook County, so the RTA Act splits the taxes collected in this area among all three Service Boards.

The RTA Act clearly attempts to put tax dollars back to work in the communities which supply them; a "local tax for local expenditures" approach. Illinois has formulated an approach where, at least to some extent, each county is supposed to "get what it paid for" in regards to mass transit. An analogous funding scheme exists in many states in the context of primary school funding since local property tax proceeds are given to the local school district. In *Rodriguez*, the Supreme Court found that district-based funding is permissible under the Equal Protection Clause even if it results in disparities in the per-child funding a school receives. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973). The Court found that the "local taxation for local expenditures" funding approach was a common method of financing public services that the Court would not nullify "merely because the burdens or benefits thereof fall unevenly depending upon the

relative wealth of the political subdivisions in which citizens live." *Id.* at 54*.*

The claim that a funding disparity exists based on differing subsidies per passenger-trip ignores the geographic element of the funding scheme. Plaintiffs have not given any facts which suggest, for example, that tax revenues are flowing from predominantly minority areas to fund mass transit projects in areas with few minorities. Or that the concept of "local taxation for local expenditures" is being violated in some manner that discriminates against minorities. Plaintiffs reference some facts based on geography, but never actually address these important issues. For example, the Complaint alleges that 33.3% of the RTA region's population lives in the collar counties, but only 15.2% of the RTA's tax proceeds come from these areas. This mentions geography, but does not address both tax collection *and* allocation. Perhaps collar county residents pay less, but they may also receive less service and allocations.

The subsidy question could just as easily be considered from the tax angle instead of the allocation angle. Based on Plaintiffs' Complaint, it appears that collar county taxpayers are being forced to subsidize mass transit at a higher rate per passenger-trip than taxpayers in the City of Chicago. On the opposite side of the coin, taxpayers in the City of Chicago, an area with more minority residents, are not required to subsidize

each passenger-trip as heavily as taxpayers in the collar counties, areas with more white residents.

It is the Plaintiffs' burden to demonstrate some measure of disparity, and their measure fails to capture highly relevant aspects of the funding scheme. This shortcoming can be clearly demonstrated through two quick examples.

First, assume that Illinois quadruples the RTA sales tax in the collar counties to 2%, but leaves it at 1.25% in Cook County. Metra would receive a massive funding boost compared to the CTA. If things were initially equitable, this change would create a disparity under Plaintiffs' measure because the subsidy per passenger-trip would drastically rise for Metra compared to CTA, even though Cook County residents would pay no new taxes.

Second, assume CTA improves its efficiency by increasing ridership by 20% without increasing service, for example through a cheap and effective advertising campaign or a general taxi strike. CTA's subsidy per passenger-trip would fall by almost 17%, while Metra's would remain the same. The mirror situation could occur: if a violent crime wave hits Metra and 20% of its riders leave in fear, Metra's subsidy per passenger-trip rises by 25%. In both situations, the funding scheme suddenly *becomes* discriminatory under Plaintiffs' measure even if it was initially equitable and was never changed.

These two situations demonstrate that Plaintiffs' claim ignores important aspects of the funding scheme and fails to distinguish between disparities and operational differences. Illinois seeks to use local taxation for local expenditures and Plaintiffs' measure of disparate effect is not plausible because it does not account for this geographic aspect. In a case where the funding scheme was based primarily on recovery ratios, the subsidy per passenger-trip may be a sufficient measure of disparity to state a plausible claim. *See Comm. for a Better N. Phila.*, 1990 U.S. Dist. LEXIS 10895. However, while the subsidy per passenger-trip is not a useless measure of disparity, it "says very little about the overall allocation of funds," *N.Y. Urban League, Inc.*, 71 F.3d at 1038, and does not, by itself, make out a plausible claim of disparate effect *in this case*. Plaintiffs have not met their burden of stating a claim upon which relief can be granted because they have not established that subsidy per passenger-trip, by itself, is an appropriate measure of racially disparate effect. Plaintiffs' Complaint is therefore dismissed for failure to state a claim under Rule 12(b)(6).

## 2. *Intentional Discrimination*

The Court has dismissed the Complaint for failing to adequately allege a racially disparate effect. There is no need to reach Defendants' allegations that Plaintiffs insufficiently pled intentional discrimination.

### 3.  *Standing*

Standing is an Article 3 requirement that a court normally considers before any substantive analysis.  The subject was extensively briefed for this motion, but because Plaintiffs in this case have failed to state a claim upon which relief may be granted, it is not advisable to analyze standing at this juncture.

"[T]he irreducible constitutional minimum of standing contains three elements":  (1) "the plaintiff must have suffered an injury in fact," (2) "there must be a causal connection between the injury and the conduct complained of," and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotations and citations omitted).  Given that Plaintiffs have not sufficiently established a racially disparate effect, it is impossible to determine if there is an injury in fact and if this injury would likely be redressed by a favorable decision.

"Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal . . . it often turns on the nature and source of the claim asserted."  *Warth v. Seldin*, 422 U.S. 490, 500 (1975).  This case is unique in that there is a real question about how any injury may be redressed, and the options available to the court in fashioning a remedy vary

depending on the exact nature of the wrong that Plaintiffs allege. A standing analysis would therefore be only speculative.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, the Court rules as follows:

1.    The Plaintiffs' Motion to Strike References to Materials Extraneous to the Pleadings is denied.

2.    The State Defendants' Motion to Dismiss is granted.

3.    The RTA's Motion to Dismiss is granted.

4.    Metra's Motion to Dismiss is granted.


**IT IS SO ORDERED.**

_____
        Harry D. Leinenweber, Judge
        United States District Court

**DATE:**      August 11, 2010